Filed 5/7/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re O.M. et al., Persons Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br>     Plaintiff and Respondent, <br><br> v. <br><br> M.M. et al., <br>     Defendants and Respondents; <br><br> O.M. et al., <br>     Appellants. | A173461 <br><br> (Humboldt County <br> Super. Ct. Nos. JV2500003, <br> JV2500004) |

When two-year-old O.M. was hospitalized for a femur fracture and nutritional deficiencies, the Humboldt County Department of Health and Human Services (Department) filed dependency petitions on behalf of O.M. and his younger sibling, E.M. (collectively, Minors). Following a jurisdictional hearing, the court dismissed the petitions. Minors appeal, arguing the uncontested evidence compelled a finding that O.M. was a child

1

described under Welfare and Institutions Code[1] section 300, subdivisions (b) and (e), and E.M. under section 300, subdivision (j).  We agree that the juvenile court erred in dismissing the allegations based on O.M.'s risk of malnutrition pursuant to section 300, subdivisions (b) and (j).  We therefore reverse and remand the matter with directions to the juvenile court to enter jurisdictional findings under section 300, subdivisions (b) and (j).  In all other respects, the jurisdictional orders are affirmed.

## BACKGROUND

### Petitions and Detention

M.M. (Mother) and D.B. (Father) are the parents of O.M. (born September 2022) and E.M. (born December 2023).[2]

On January 7, 2025, the Department filed dependency petitions on behalf of then two-year-old O.M. and then one-year-old E.M.[3]

As to O.M., the petitions described him as a child within section 300, subdivisions (b) (failure to protect) and (e) (severe physical abuse).  Under section 300, subdivision (b), count b-1 alleged that on December 30, 2024, O.M. "was taken to the emergency room (ER) due to a leg injury he received in [father and mother's] care. . . . [O.M.] suffered a broken femur in his parents care . . . . The parents' recollection of how the injury happened were initially different stories.  [O.M.'s] injury is the result of a significant impact.  Neither parent flew with [O.M.] from Humboldt to Oakland.  The parents

---

[1]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

[2]    Mother was pregnant with their third child during the proceedings.  Father had three other children from a prior relationship.

[3]    A separate case number was assigned to each of the Minors in the superior court (case no. JV2500003 for O.M. and case no. JV2500004 for E.M.), but their cases were frequently heard together.

2

were not staying bedside with [O.M.] while he is being treated at UCSF. [Mother] left the hospital during [O.M.'s] surgery and was not able to be reached.  [O.M.'s] broken leg, the parent[s'] lack of information as to how the injury occurred and the parents' absence [at] the hospital places [O.M.] at risk of serious physical harm . . . ."

Count b-2 alleged that O.M. "is being treated for malnutrition in addition to his broken femur.  He is less than 1% for his height and 1% for weight for his developmental age.  The evidence of his malnutrition are his elevated levels of vitamin D-12, Microcytic anemia (iron deficiency), and his vitamin D and phosphorus is low.  The mother was observed by hospital staff to be watering down [O.M.'s] soy formula.  The mother and father's prolonged failure to provide adequate nutrition placed the child [O.M.] at risk of severe physical harm."

Count b-3 alleged Mother was referred to services to address O.M.'s developmental issues, but she did not follow up with some of the services and denied others.

Under section 300, subdivision (e), count e-1 of the petition was similar to count b-1, except that it did not include allegations pertaining to the parents' absence at the hospital.  Count e-2 was identical to count b-2.

As to E.M., the Department alleged she fell within the meaning of section 300, subdivision (j) in that she was at risk of being abused or neglected based on the abuse and neglect of her sibling.  Specifically, count j-1 was predicated on the facts surrounding O.M.'s femur fracture, and count j-2 was predicated on O.M.'s malnutrition.

According to the detention report, Father stated that on December 30, 2024, as he was changing O.M.'s diaper on an air mattress in their RV, O.M. ran away from him and so Father grabbed him by the leg to pull him back.

3

Father pulled hard enough to feel O.M.'s leg snap. Because Father did not elaborate on why O.M. was running, the reporting party did not believe Father was disclosing everything that happened. Also, Father's description of what happened to cause O.M. a broken femur "was not congruent with the severity of the injury."

Also according to the reporting party, Mother stated that she was changing O.M.'s diaper, and that while he was rolling around, she heard a pop. Mother later denied reporting this story, before repeating Father's version of the incident.

O.M. was admitted to St. Joseph Hospital on December 30, 2024 for his femur injury and flown to UCSF Children's Hospital in Oakland (UCSF) that same night. Neither parent flew with O.M. to UCSF. Instead, they drove there and did not arrive until the next morning.

O.M. was treated for malnutrition in addition to his femur fracture. He was at less than 1% for his height and 1% for his weight for his developmental age. Other evidence of malnutrition included O.M.'s elevated levels of vitamin D-12, iron deficiency, and low levels of vitamin D and phosphorus. Hospital staff also saw Mother "water down" O.M.'s soy formula.

On December 31, 2024, the day of O.M.'s surgery on his femur, Mother did not stay at his bedside despite staff explaining the importance of her doing so. Meanwhile, Father stayed at a hotel with E.M.

The report also noted that O.M. was diagnosed with speech and developmental delay. UCSF offered Mother services to address these diagnoses but she declined.

At the detention hearing on January 8, 2025, the court ordered minors detained, placed them in a local resource family home, and set the

4

jurisdiction hearing for January 29.

**Proceedings Leading Up to the Jurisdiction Hearing**

On January 21, the Department submitted its jurisdiction report. It contained some of the same information as the detention report, but detailed observations that the Department had with UCSF staff and the parents. For example, during a meeting between UCSF staff and Department social workers, a UCSF social worker recounted Mother's version of the events: she was asleep on an air mattress and "she heard something happening," which caused her to wake up. Father "yanked [O.M.] and he twisted and rolled off." Mother shared that Father "didn't deal with his frustration well and was aggressive," but there were no similar incidents in the past. The report also noted a physician's assistant's observation that the injury "sounded like it was a pulling and twisting mechanism with force," but that "[i]t doesn't sound intentional."

The report further indicated that O.M. was in the third percentile for weight and less than one percentile for height. He "appeared to be very small for his age and . . . very light in weight." UCSF reported concerns about O.M.'s nutritional intake. Mother stated the whole family was vegan. She acknowledged that O.M. was skinny but had no concerns about his nutrition. Because O.M. was on a vegan diet, medical staff were concerned that the parents were not giving him all the necessary nutritional elements to sustain his health. While being treated at the hospital, O.M. lost about one-and-a-half pounds. He needed to gain weight in order to be discharged.

UCSF became concerned that O.M. was at risk of "refeeding syndrome," which "occur[s] when someone who has been malnourished begins feeding again. If the food is introduced too quickly, it can cause serious complications. This happens because of the ways our bodies change when they are deprived of nutrients. When refeeding begins, the body has to

5

change back and the body may not have the resources it needs." Based on this concern, hospital staff closely regulated O.M.'s feeding and monitored his labs. As of January 2, 2025, O.M. was treated for possible malnutrition, and no longer his femur fracture.

The Department recommended that the court sustain the allegations in the petitions.

On January 28, the Department submitted its "first addendum" to the jurisdiction report, which attached O.M.'s medical records from UCSF. Among other things, the records noted O.M. was diagnosed with a spiral fracture of the left femur. The records also stated that "[m]ost likely this fracture is from non-accidental trauma . . . ." O.M. underwent surgery for the fracture.

The records further stated that O.M. was "at high risk of malnutrition." He was diagnosed with poor weight gain, vitamin D deficiency, and iron deficiency anemia among other conditions. He was underweight, with his weight being in the third percentile. O.M. was on a vegan diet, which consisted primarily of soy milk, but that he was "not taking adequate volumes to meet needs given" that the soy milk was "diluted with water."

While being treated, UCSF changed his diet from vegan to vegetarian. The hospital was concerned about refeeding syndrome and thus closely monitored O.M.'s feeding and lab work. O.M.'s "weight was trended and he continued to gain weight during the admission. He was on a strict calorie count and was eating enough to facilitate growth and healing." The records indicated O.M. would benefit from additional vitamin D supplements and consistent iron supplements. While at the hospital, staff encouraged Mother to give O.M. a daily iron multivitamin supplement, meals and snacks as able, full strength soy milk, and Kate Farms-brand formula. O.M. was discharged

6

on January 7, at which time he was tolerating a regular diet.

The court continued the jurisdiction hearing to March 26 and set a pretrial hearing on March 13. At the pretrial hearing, the court granted Mother's request to proceed in propria persona and continued the jurisdiction hearing to April 3.

On April 1, Father filed an "Affidavit in Opposition to jurisdiction." In it, Father attested that O.M.'s femur injury "was purely accidental." Father was trying to change O.M.'s diaper on an air mattress. O.M., however, threw a tantrum and tripped over Father's arm, after which O.M.'s "lower half impacted the corner of [a] wooden slide-out frame and the floor." Father placed O.M. on the bed and noticed swelling on his left leg. Father panicked and called for Mother, and they quickly called the paramedics. Father stated he had been a father for 16 years and had never abused his children.

Father disclosed he had autism, which affected his ability to communicate clearly, especially under stress. He was under stress and struggled to explain what happened to O.M., leading to misunderstandings. Mother misunderstood what he had tried to explain to her. The parents realized the misunderstanding once they discussed the incident later.

Father said he was not with O.M. at the hospital because the hospital had a policy prohibiting young children from visiting. He stayed with E.M. while Mother stayed with O.M. Mother stayed at the hospital and left only to drop off food for Father and E.M.

The family was vegan and the parents fed the children a balanced diet. The parents were naturally smaller, as were the children. The parents had supplemented the children's diets with multivitamin drops. Father denied that he and Mother restricted food or nourishment from O.M.

On April 3, the Department submitted a "second addendum" to the

7

jurisdiction report that attached additional records from UCSF. The records indicated that UCSF conducted testing to determine if O.M. had a genetic condition that may have contributed to his diagnoses of the femur injury or risk of malnutrition. No such genetic disorders were detected.

Meanwhile, the court continued the jurisdiction hearing to May 13.

On May 12, Mother in propria persona served on the parties various documents, including an "Affidavit of Statements and Truth" disputing the allegations in the petitions, which documents were later filed with the court.

In her affidavit, Mother stated among other things the following: "Allegations of malnutrition and refeeding syndrome are inaccurate and damaging. My children have always been fed nutritious home-cooked vegan meals, snacks on demand, bottles always full, and there was never any intention or act of starving them, making the basis that my son could have gotten refeeding syndrome impossible . . . . When hospital was attempting to hold my son based on 'concerns' of refeeding syndrome, I did not understand that I was outright being accused of not feeding my son . . . . [I]n reality my son is very picky but ate and requested food regularly . . . . He had two extremely common found vitamin deficiencies that 15-30% of toddlers have/get (vitamin D and iron deficiency) both which would be easily balanced/fixed with their vitamins I should have given more consistently but that's an easy fix, not malnutrition . . . . [Minors] are simply small, they have always been small. . . . The claims for malnutrition were completely based on my babies' small percentiles and potentially the drop in height percentile since his last appointment. . . ." Mother went on to state that she "will be filing complaints and doing what [she] can to get justice for the deliberate lies spoke about [her]."

8

**Jurisdiction Hearing**

The continued, contested jurisdiction hearing commenced on May 13 and occurred over the course of several days, concluding on May 28.

At the start of the hearing, the Department's counsel stated that based on her conversations with UCSF nurse practitioner Kelsey Merl, the Department was requesting to dismiss counts b-2, b-3, e-2, and j-2. Counsel for Minors agreed to the dismissal of count e-2, but objected to the dismissal of any of the other counts. The court dismissed count e-2.

The court admitted into evidence the Department's jurisdiction report and addenda, an exhibit containing a photo of the bed involved in the incident, and Mother's affidavit. The court heard testimony from various witnesses, including nurse practitioner Merl, Father, and Mother, who were called as part of the Department's case.

*Witness Testimony*

**UCSF Nurse Practitioner, Kelsey Merl**

Kelsey Merl testified she was a pediatric nurse practitioner at UCSF. She worked in the hospital's Center for Child Protection department, which conducted medical evaluations of children who were the subject of possible maltreatment. Merl evaluated O.M.'s case.

Regarding the issue of malnutrition, Merl testified that O.M. had experienced steady growth in the first six months of his life, but his growth percentiles dropped during the 12- to 24-month-old period to around or below the fifth percentile of growth. When he was admitted to USCF, at 28 months, his percentiles were "consistently growing below" and needed further evaluation. His overall weight and fat tissue were less than normal. His lab results indicated he was deficient in iron and vitamin D, and his vitamin B-12 levels were elevated. He was anemic due to the iron deficiency, and his vitamin D deficiency placed him at risk of suffering adverse effects such as

9

rickets, which causes fragile bones that can break easily.

UCSF diagnosed O.M. with being at risk for malnutrition. Merl testified that if O.M. had not sustained the fracture, but had the same nutritional deficiencies, he still would have been admitted for a medical evaluation based on a concern for malnutrition. A team of specialists, including an endocrinologist and dietician, worked on assessing his current diet, what nutrients he was lacking, and how to get the necessary nutrients into his diet. Merl was aware that O.M. was on a vegan diet, which she understood consisted of soy milk and water and vegan table foods. UCSF was concerned "about the soy milk being diluted with water" because it "doesn't provide enough calories for a child as well as can cause electrolyte or nutritional imbalance."

UCSF determined that O.M.'s diagnosis was caused by both inadequate nutrition and nutritional imbalance—i.e., he was not receiving enough and the right type of nutrition at home. O.M. was given medication, vitamin supplements, a high calorie supplement, and a new feeding regimen.

O.M. lost weight while he was in the hospital, which Merl attributed to several factors, one of which was that he could not have a full stomach prior to surgery. Another factor was that he was at risk of refeeding syndrome, which, as noted above, refers to a potentially fatal condition caused by rapid initiation of refeeding after a period of being undernourished or as a result of having low body mass index. As Merl explained, that rapid initiation of refeeding may cause "fatal electrolyte shifts," which in turn "can cause things like cardiac arrhythmia [and] seizures."

As such, the hospital placed O.M. on a regimen to protect him against refeeding syndrome. This regimen consisted of giving him thiamine (vitamin B), monitoring his labs every four to six hours, and slowly progressing his

10

feeding up to a full diet.

In addition to his femur injury, O.M. was treated for his nutritional deficiencies from December 30, 2024 through January 7, 2025. Around the time of discharge, O.M. was gaining weight under his new feeding regimen. When O.M. was discharged, he did not have refeeding syndrome. Merl testified that as long as O.M. continued to receive adequate calories and grew along healthy percentiles, he would not be at risk of refeeding syndrome. O.M.'s treatment plan was "making sure that he has adequate calories," "that the formula . . . is not watered down," "that he's getting the full calories," and that he receive multivitamins, iron and vitamin D.

Merl also testified that in general a child can safely be on a vegan diet, so long as the family or caregiver works closely with the child's primary care provider and, if necessary, a registered dietician, to ensure that the child receives adequate calories and nutrients. Merl recalled that at the hospital a dietician had met with Mother and provided her with "preliminary education," but Merl did not know "what . . . education continued when the family was no longer able to be at the hospital."

As for E.M., she received a skeletal survey at UCSF. Her weight was in the lower percentiles.

Turning to the incident that led to O.M.'s femur injury, Merl reviewed O.M.'s medical charts and conferred with the treatment providers, who in turn had spoken with Mother. Merl testified: "The specifics of what exactly what happened with [O.M.'s] body were . . . slightly different and where everyone was located in the room. Those little details are so important, but they were a little different in each note. So I don't know exactly what happened from, you know, the person who was taking care of [O.M.] in that moment. . . . The mom . . . generally reported that . . . [O.M.'s] dad was

11

changing [O.M.'s] diaper; [O.M.] was throwing a tantrum; [O.M.'s] dad yanked on the leg and he, quote, 'got frustrated, he didn't mean to.' [O.M.'s] body was falling off the bed and the leg was yanked. . . . So generally, there was a point in time when [O.M.] was injured during the diaper change."

Hospital staff expressed concern that the parents' summaries of the incident continued changing. Merl considered that a "red flag, meaning that we need to really understand why are the details different in different notes and how can we obtain one really good detailed history."

Merl testified that a spiral femur fracture could be caused by grabbing and pulling on the leg. When asked "[w]hat kind of force is needed to cause a spiral fracture," Merl replied that a spiral femur fracture requires "a high energy force." However, she explained that "there's no . . . real way to quantify with, numerically what type of force." She added, "Whoever was there knows exactly what the trauma was, exactly what happened, and knows that the child was seriously injured."

Merl was also asked whether tripping and hitting one's leg on the side of the wall, which she described as blunt force trauma, would cause the impact needed to create a spiral fracture. Merl testified, "I think for me to say yes or no to a specific mechanism, I would need a lot of details about what exactly what was going on, what does the room look like—a lot of different details to answer that question adequately. . . . I think bringing up the idea of could an impact to the side of the leg cause the injury, that, I would say, is highly unlikely . . . [¶] . . . [¶] . . . because typically, . . . when we see these spiral femur fractures, it's that mechanism where there's twisting to the leg and force being pulled on the leg . . . ." That said, she testified that blunt force trauma to the side of the femur was "not impossible" and could not "exclude it without having more, a lot more details about the event itself."

12

When asked whether UCSF understood the injury to be non-accidental, Merl testified, "at this time, without that really detailed history"—in particular "requests for further history taking and . . . video reenactment of how the injury occurred"—"it's difficult to say with any level of certainty whether this was an unintentional accidental event or an inflicted event."

**Father**

Father testified he was diagnosed with autism and anxiety and was not good at communicating and explaining things.

As to the incident, Father stated he was trying to change O.M.'s diaper on a mattress, but that O.M. was throwing a tantrum, and running and throwing himself around. Father tried to calm him down and reached out to try to grab him but did not actually do so. O.M. then "tripped on [Father's] arm and hit the side of . . . the corner of the wall of the pop-out [to the RV]" "really hard." Both of O.M.'s legs hit the wall. Father did not hear a pop sound. Father picked up O.M. from the ground and rolled him on to the bed. O.M. was screaming and his leg was swelling up, and so the parents called 911.

Father testified that there had been no concerns about O.M.'s weight or height at his doctor's appointments. O.M. consistently ate three meals and had about six or seven snacks during the day. The parents gave him vitamins every day. Father was surprised that O.M. required treatment for nutritional deficiencies. Father acknowledged that he and Mother gave O.M. soy milk that they would water down. But Father explained that someone from the WIC program had advised them to do so as a way to encourage O.M. to eat more solid foods and drink less soy milk.

Father signed up for a nutrition class but had not started. Father testified he would increase O.M.'s calorie intake. Father also completed a parenting class.

13

**Mother**

Regarding the incident on December 30, 2024, Mother testified that she was asleep when O.M. was injured. She heard commotion; O.M. was throwing a tantrum. She was not aware Father was trying to change O.M.'s diaper. Father woke Mother up and she saw that O.M.'s leg was swollen. She asked Father if he yanked O.M.'s leg and he said yes. Mother acknowledged she initially told the medical providers that Father was changing O.M.'s diaper and was rough with him, that O.M. twisted off the bed and Father yanked him, and that Father heard a pop.

Mother did not believe Father's story changed; instead they misunderstood each other. Mother said that Father was "really bad at explaining things." Once they returned home, Father showed her "what happened and it was different," namely that O.M. had "tripped over into the wall." Mother believed the incident was an accident. Mother denied Father was ever rough with O.M. He just was not "as gentle" during diaper changes, meaning he did not try to soothe Minors while changing their diapers. Mother denied ever telling hospital staff that Father "learned his lesson" or that she was changing O.M.'s diaper during the incident.

Regarding the issue of malnutrition, Mother testified O.M. ate breakfast and dinner, "a couple snacks for lunch," and snacks throughout the day. O.M. asked for food and ate all day and "was in no way starved." He was a picky eater and would refuse food he did not like. Mother said that "it's important to feed him what he likes because he's picky. And he won't eat it if he doesn't." O.M. liked vegan burgers and nuggets and "typical toddler food."

Mother testified she was "surprised" that O.M. was admitted to the hospital for nutritional deficiencies; she had "no idea" he had a vitamin D deficiency or that he was anemic. She did not know he was not getting

14

enough calories.  Mother gave him a multivitamin, but not consistently.

Mother said that O.M. "was small," but that was "normal" for their family, who "are all small."  In prior doctor visits, O.M.'s growth percentiles for his height and weight were explained to Mother.  Mother acknowledged that providers mentioned that O.M. "may have been getting a little lower" in his "growth curves."

Mother testified that O.M. was "medically kidnapped" at UCSF.  In her view, O.M. should have been discharged immediately after his femur surgery, either to a hospital closer to their home or to the parents.  Mother said, "We just needed to go home really bad" and that there was nothing that she could not provide him at home instead of at UCSF.

When asked to clarify her position, Mother acknowledged that O.M. needed medical care to correct his nutritional deficiencies, but by "medical care," she meant just "a couple medications . . . to fix his anemia and his vitamin D."  She agreed that she needed to "increase his calories" but that he did not need to be hospitalized.  This is because, Mother testified, "they were claiming he had refeeding syndrome," but that "he would have to have been starved for him to get refeeding syndrome" and "he was never starved."

Mother later acknowledged that UCSF did not diagnose with, but rather monitored O.M. based on a concern he could develop, refeeding syndrome.  And in response to Mother's statements regarding O.M.'s eating, this exchange occurred between Minors' counsel and Mother:

"Q.    So in the couple months before [O.M.] was hospitalized, do you think that he was eating enough at that time?

"A.    Pretty much.  But I—like I—I—he would be picky a little bit sometimes.  And I would—I—it's not like—I don't know.  I could feed him.  I just see where I could feed him a lot more calories.  It's not like I didn't—and

definitely miscommunicating myself, but—sorry.  Can you repeat the question?

"Q.    In the couple months before [O.M.] was hospitalized, do you think he was getting enough to eat?

"A.    I—I—like, pretty much.  Like, I—I didn't know he had lost weight.  And I was very willing—

"Q.    So it's a yes or no question.  Do you think he was getting enough to eat?

"A.    I mean, I'm going to say, like, yes.  Like, I was feeding him adequately.  But, yes, like, I don't know.  I mean, it's hard.  It's kind of subjective because, like, he was, losing—he lost some weight.  And I just didn't know, but he was eating.  Like, yeah, he was eating.  So I just saw that I should feed him more.  You know?  So can I not answer that?  Is that possible?

"Q.    I think you've given an answer."

Father's counsel also asked Mother:  "You stated that you thought that you should feed [O.M.] more.  When were you referring to, before or after the accident?"  Mother testified:  "Like I—I guess, I was referring to saying that I should feed him more.  I don't know.  I don't know.  Sorry.  I'm kind of confused how to answer that."

When O.M. was hospitalized, Mother talked to a UCSF nutritionist about O.M.'s new feeding regimen, how the parents "could increase [O.M.'s] calories" and the type of shakes and formula that he should have.  Mother said she was willing to follow that feeding regimen.

When asked what she would to do increase O.M.'s calories, Mother testified that she would give him "things that he really likes because he's the type of child that . . . won't eat if he doesn't like it."  Mother was asked to give

16

examples of food that O.M. did not like. She said, "half the things he doesn't like" but could not "think of anything right now." She identified food that O.M. liked, but said that even with some food he liked, such as strawberries, he would not necessarily eat them: "sometimes he won't eat strawberries. Sometimes he'll love strawberries." Mother said that "[i]t's really hit or miss with him."

Mother testified that O.M. drank soy milk with water, but said, "I never knew it was a problem. I still don't understand why it's a problem. He had more than 8 ounces a day."

Mother had signed up for an online basic nutrition class, but had not started it. Mother started a parenting class, but had not completed it.

### Arguments

On May 28, during closing argument, the Department's counsel renewed the Department's motion to dismiss counts b-2, e-2, and j-2 of the petitions (based on O.M.'s treatment for risk of malnutrition), as well as count b-3 (based on Mother's failure to engage in services to address O.M.'s developmental delay).

Mother and counsel for Father asked the court to dismiss the petitions in their entirety.

Minors' counsel asked the court to sustain all counts except counts b-3 and e-2.

### Juvenile Court's Ruling

Following that argument, the court announced its ruling. It began by stating: "I think the evidence supports that [O.M.] was jumping around, having a tantrum and not listening. . . . I think [Father] grabbed him trying to get him down. I don't think he intended to hurt him. I think this was an accident. I do think there are some differences in the version of events, but I don't necessarily think that's anybody being dishonest. I think people are

17

trying to make it make sense as to what happened. . . .

"I can tell you, as I've heard the evidence, . . . I really felt like I needed a jurisdiction. But after I have reviewed what I think I would need as far as evidence to convince me that that would be justified, I just don't think it's there. I have a child who's injured. I don't know exactly how the child was injured. I believe the child was injured because of a yank of a leg. But the nurse practitioner could not quantify— well, has to be with force, but I can't tell you how much force. I can't tell you— so she can't tell me if it was more force than what would have been necessary to hold him back on the bed; and that's where I'm stuck. So if the expert can't tell me that, I don't believe I have sufficient evidence to be convinced of that."

The court nevertheless expressed it was "worried about [Minors]" and that the parents "need some support" and "parenting education." The court went on to state, however, that the parents "can do that without the Court taking jurisdiction." The court then commented, "So I find myself surprised by hearing myself saying that I'm going to deny the petition because while I . . . think there's something there, I don't think that I have enough evidence to support me taking jurisdiction. But that's going to be my ruling." The court did not expressly address the issue of malnutrition.

At that point, Minors' counsel asked the court to stay the proceedings pending any appeal. During the course of this discussion, counsel stated, "Your Honor, I'm concerned about the well-being of the children, especially if they're immediately returned home. . . . There's severe lack of insight here as to what occurred and even needing medical care in the situation." The court replied, "I don't disagree with that from when it was first presented. But . . . can I find that today, as we sit here, that either child is in danger of physical harm? I don't think I can. . . . [A]s to the nutrition, and those are

18

things that mother was very clear . . . that she does recognize that now." Minors' counsel argued: "I disagree with that. She wanted to remove [O.M.] from the hospital. She doesn't think that he needed the treatment he needed, that she thought he needed vitamin drops. I think we're going to go right back to where he was with nutrition if we return them home. I don't think that she even understood that she wasn't feeding him enough. She kept saying, well, he was getting enough to eat. That was her testimony. And that's not the hospital's opinion." The court then stated: "But I think she also testified that she understands now and would work to increase those calories and would work with a nutritionist."

The court later commented, "I just can't . . . sustain the petition. . . . I feel like I want to; but me wanting to isn't the same as . . . there is enough evidence that I believe that decision can be supported. . . ." Lastly, the court stated, "I don't believe I can stay [the proceedings] pending appeal."

On June 2, Minors filed a notice of appeal.

On June 20, the court filed its "Findings and Orders After Jurisdiction Hearing."[4]

Subsequently, we appointed separate appellate counsel for each parent.

## DISCUSSION

Minors contend that "[n]o substantial evidence supported" the dismissal of the petitions because "a preponderance of the evidence showed [Minors] suffered or were at risk of suffering serious physical abuse under section 300, subdivisions (b)(1), (e) and (j)." The Department has filed a respondent's brief, but does not raise any substantive arguments opposing

---

[4] Assuming that the notice of appeal was premature since it was filed before the issuance of the court's June 20 findings and orders, we "treat the notice as filed immediately after the rendition of . . . the making of the order[s]." (Cal. Rules of Court, rule 8.406(d).)

19

the Minors' arguments.  Instead, the Department states that it submitted its brief "only to make a narrow point about the correct standard of review," and that it is "sympathetic to the minors' plight and wishes the juvenile court had ruled differently."  On the other hand, Mother and Father each have filed a respondent's brief disputing the arguments in Minors' opening brief.[5]  Before we address the parties' assertions, we set forth the general legal principles.

**General Legal Principles**

"The goal of dependency proceedings, both trial and appellate, is to safeguard the welfare of California's children.  'The objective of the dependency scheme is to protect abused or neglected children and those at

---

[5]     Although their respective counsel have filed respondent's briefs on their behalf, the parents have filed, in propria persona, various documents in this court while briefing was ongoing.  For example, Father filed documents entitled:  "Notice Regarding False Statements in" Minors' opening brief; "Supplemental Notice of Misrepresentation" of facts contained in Minors' opening brief; "Supplemental Response to Appellants' Reply Brief"; and an accompanying declaration.  Mother filed documents entitled "Affidavit of Statements and Truth" and "Response In Opposition and Motion to Strike Appeal."  With the exception of Mother's "Affidavit of Statements and Truth," these documents were not filed in the trial court.  Also, the documents cite to, and make arguments based on, material that is not part of the record on appeal.  "As a general rule, documents not before the trial court cannot be included as part of the record on appeal" and thus must be disregarded as beyond the scope of appellate review.  (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1, disapproved on other grounds in *Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 573–574, 582 & fn. 4.)  Further, " '[f]actual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs.' "  (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 366, fn. 8.)  Thus, to the extent the documents refer to and rely on material not included in the record on appeal, we do not consider them.  We further deny both parents' requests to disregard certain statements in the opening brief, as well as Mother's requests to "strike the appeal" and issue sanctions against Minors' trial and appellate counsel.

substantial risk thereof . . . .' [Citation.] These proceedings are ' "designed not to prosecute a parent, but to protect the child." ' [Citation.] The best interests of the child are paramount." (*In re Josiah Z.* (2005) 36 Cal.4th 664, 673.)

Section 300 begins: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court . . . ." Then follow several subdivisions describing children who may fall within the juvenile court's jurisdiction. The Department alleged that O.M. came within subdivisions (b) and (e), and E.M. within subdivision (j).

Section 300, subdivision (b)(1) states in pertinent part that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . . [¶] (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

Section 300, subdivision (e) states in relevant part that "[t]he child is under five years of age and has suffered severe physical abuse by a parent . . . if the parent knew or reasonably should have known that the person was physically abusing the child."

And section 300, subdivision (j) states in part that "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

As Minors acknowledge, in addressing the "substantial risk" of harm requirement of subdivisions (b) and (j), courts have held that the past

21

infliction of harm by a parent, standing alone, does not provide a basis for jurisdiction; there must be some reason based on circumstances at the time of the jurisdiction hearing to believe the acts may continue in the future. (See *In re Carlos T.* (2009) 174 Cal.App.4th 795, 803, 805; *In re James R.* (2009) 176 Cal.App.4th 129, 135–136.) But "[a]lthough section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602.) When evaluating the potential of future risk, the juvenile court may consider a parent's insight (or lack thereof) into the problems that led to the child welfare agency's intervention. (See, e.g., *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 996; *In re John M.* (2012) 212 Cal.App.4th 1117, 1124–1125.)

Further, a child may be brought within the juvenile court's jurisdiction as a result of the conduct or omission of either or both parents that results in the child being described by section 300; there is no requirement that there be jurisdictional allegations regarding conduct by both parents. (*In re John S.* (2001) 88 Cal.App.4th 1140, 1143.)

At the jurisdiction hearing, the Department has the burden of proof as to each fact necessary to sustain the petition (*In re Lauren P.* (1996) 44 Cal.App.4th 763, 769; *In re S.D.* (2002) 99 Cal.App.4th 1068, 1078), and the standard of proof is a preponderance of the evidence. (*In re I.C.* (2018) 4 Cal.5th 869, 876; § 355, subd. (a).) "[I]f [the Department] fails to meet its burden of proof, the juvenile court is statutorily required to dismiss the petition." (*In re Lauren P.*, *supra*, 44 Cal.App.4th at p. 769; § 366.) "However, it has been held that [the] statute cannot be applied literally so as to prevent other parties from presenting evidence in support of the petition.

[Citation.] If the [Department] fails to meet its burden, the trial court must give the other parties an opportunity to supply the evidentiary deficiency." (*In re Lauren P.*, at p. 769.)

**Standard of Review**

Minors argue that the juvenile court's dismissal of the petitions is reviewed under the substantial evidence standard. However, as both the Department and Mother note, because the Department bore the burden of proof below, the substantial evidence standard of review "takes on a unique formulation" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671), a point that Minors apparently concede in their reply brief. As explained in *In re I.W.* (2009) 180 Cal.App.4th 1517 (*I.W.*): "[W]here the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case. [Citations.]

"Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*I.W., supra,* 180 Cal.App.4th at p. 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4; accord, *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 [in reviewing dismissal of dependency petition, "[a]bsent indisputable evidence of abuse [or harm]—

evidence no reasonable trier of fact could have rejected—we must therefore affirm the juvenile court's determination."].)[6]

Despite this different formulation of the substantial evidence standard, the basic tenets of the substantial evidence review standard still apply. (See *I.W., supra,* 180 Cal.App.4th at p. 1528.) We do not resolve or reweigh any conflicts in the evidence. (*Ibid.*) We also normally defer to the trier of fact's drawing of inferences, so long as the inferences are reasonable. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 (*Kuhn*).) " 'Reasonable' inferences do not include those which are contrary to uncontradicted evidence of such a nature that reasonable people would not doubt it." (*Id.* at p. 1633, fn. 4.) In other words, " 'the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.' " (*Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487 (*Western*

---

[6] We apply the standard in *I.W.* even though the Department, who is not appealing the juvenile court's ruling, had the burden of proof below. (See *In re Luis H.* (2017) 14 Cal.App.5th 1223, 1226–1227 (*Luis H.*).) In *Luis H.*, the court held that the standard set forth in *I.W.* applied to an appeal of two minors from the dismissal of a dependency petition brought on their behalf. *Luis H.* noted that the appellant in *I.W.* "was also the party who bore the burden of proof in the juvenile court proceedings," whereas in *Luis H.*, "[the agency] bore the burden of proof at the jurisdictional hearing [citation] but only [the minors] appeal the dismissal." (*Luis H., supra,* 14 Cal.App.5th at p. 1226.) The court did not, however, "believe that this distinction changes the nature or standard of our review." (*Ibid.*) Because the minors "were represented by counsel who had the opportunity to present evidence at the jurisdictional hearing and who advocated for the court to sustain the dependency petition," it saw "no reason to depart from the general rule that 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Id.* at p. 1227.) We apply that reasoning here.

*Digital*).) " 'Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.]' " (*Ibid.*)

**Analysis**

Minors challenge the dismissal of counts b-1, b-2, e-1, j-1, and j-2 of the petitions. As discussed above, the "b" counts were alleged on behalf of O.M. under section 300, subdivision (b); the "e" counts on behalf of O.M. under subdivision (e); and the "j" counts on behalf of E.M. under subdivision (j). In their briefs, Minors address together and assert the same arguments with respect to counts b-1 and j-1, and likewise as to counts b-2 and j-2, before separately addressing count e-1. We address the arguments in a slightly different order than presented in Minors' briefs.

### *Counts b-1 and j-1: Physical Abuse*

Count b-1 alleged that O.M. suffered, and was at substantial risk of suffering, serious physical harm or illness under section 300, subdivision (b), as a result of him sustaining a femur fracture while in his parents' care. Count j-1 alleged that based on the events surrounding O.M.'s femur fracture, E.M. was also exposed to substantial risk of abuse under section 300, subdivision (j). Minors contend that the juvenile court erred in dismissing counts b-1 and j-1, because the "indisputable evidence—evidence no reasonable trier of fact could have rejected— showed [O.M.] suffered serious physical harm (a broken femur) and he and [E.M.] remained at risk of serious physical harm." In essence, Minors contend the evidence compelled a finding as a matter of law that Father had inflicted O.M.'s injury non-accidentally.

In support of their claim, Minors point to evidence that favor their position. But there was competing evidence that they ignore. For example, Minors cite to evidence that the parents gave inconsistent accounts of the incident that led to O.M.'s femur fracture. However, Father testified that he

25

had autism and difficulty with communicating clearly, especially under stress, including when he communicated to Mother, the Department, and UCSF staff how O.M. was injured.

Minors also point to O.M.'s UCSF medical records where they state that his femur fracture was "most likely . . . from non-accidental trauma." However, a physician's assistant from UCSF reported that the injury "doesn't sound intentional." And in contrast to both of those observations, nurse practitioner Merl testified that she could not say one way or another whether the injury was accidental or intentional because she lacked sufficient information to make such a determination.

Minors further point to Merl's testimony that a "high energy force" was required to cause the fracture. However, Merl testified that "there's no . . . real way to quantify" that amount of force. And so, as the court observed, Merl could not say if the force exerted by Father "was more force than what would have been necessary to hold [O.M.] back on the bed."

In sum, there was conflicting evidence as to whether the injury inflicted on O.M. was accidental or intentional. The existence of this conflicting evidence undermines an essential part of the argument necessary to obtain reversal: that "the appellant[s'] evidence was . . . 'uncontradicted and unimpeached[.]' " (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Moreover, the court resolved the conflicts in the evidence against Minors when it found that the injury "was an accident" and, therefore, that there was insufficient evidence that Minors faced a current or future risk of serious physical harm. As discussed, where the evidence is conflicting or competing, it is not our function to revisit the court's failure-of-proof conclusion. (See *id.* at pp. 1528–1529.) To the extent Minors impliedly invite us to do so, we decline that invitation. Accordingly, Minors fail to establish the evidence compelled a

26

finding of jurisdiction as a matter of law on the basis of counts b-1 and j-1.

### *Count e-1: Physical Abuse*

We turn to Minors' challenge to the dismissal of count e-1, which was predicated on the allegations based on O.M.'s femur fracture and alleged that O.M. suffered severe physical abuse under section 300, subdivision (e). Minors argue that the court erred in dismissing count e-1 because "Substantial evidence showed [O.M.'s] injuries were more than likely not accidental." This is essentially a restatement of their arguments made in connection with counts b-1 and j-1, which we have considered and rejected. For the reasons stated above, we also conclude Minors fail to establish the evidence compelled a finding of jurisdiction on the basis of count e-1.

### *Counts b-2 and j-2: Malnutrition*

We reach a different conclusion, however, with respect to the dismissal of counts b-2 and j-2.

As noted above, count b-2 alleged that O.M. was hospitalized for malnutrition in addition to his femur fracture, that the parents failed to provide him with adequate nutrition, and that they therefore placed him at risk of severe physical harm (§ 300, subd. (b)). Based on those same allegations, count j-2 alleged that E.M. was also at risk of neglect (§ 300, subd. (j)).

In contrast to the counts based on O.M.'s femur fracture, the basic facts underlying counts b-2 and j-2 were not in dispute: O.M. was diagnosed with being at risk of malnutrition when he was admitted to UCSF on December 30, 2024. His lab results indicated he was deficient in iron and vitamin D. He was anemic due to the iron deficiency, and his vitamin D deficiency placed him at risk of suffering adverse effects such as rickets, which causes fragile bones that can break easily. O.M.'s fat tissue and weight were less than

27

normal.  His growth percentiles dropped during the period of when he was 12 and 24 months old, and remained low.  UCSF determined the cause of O.M.'s diagnosis was that he had not received adequate and proper nutrition at home.  O.M. was treated for his nutritional deficiencies from December 30, 2024 through January 7, 2025.  During that time, UCSF was concerned about O.M. potentially suffering from refeeding syndrome, which carried serious and possibly fatal complications.  Thus, it closely monitored his labs and gradually increased feed until he could tolerate a full diet.

It was also uncontested that O.M.'s medical charts from prior doctor visits did not explicitly state that O.M. was undernourished or improperly nourished.  In November 2023, the provider noted O.M. was "growing and developing well."  However, in August 2024, the provider noted that O.M. was "generally *not* growing and developing well."  (Italics added.)

Against this background, in determining whether O.M. was at substantial risk of serious physical harm or illness within the meaning of section 300, subdivisions (b)—and, consequently, that E.M. was at risk of neglect under section 300, subdivision (j)—the court considered the parents', and in particular Mother's, insight into the reasons that led to O.M.'s nutritional deficiencies and their then present ability to ensure that O.M. would receive adequate and proper nutrition if returned to their care.  Minors' counsel asserted that "[t]here's [a] severe lack of insight here as to what occurred and even needing medical care in the situation."  The court stated it did not "disagree with that from when it was first presented."  However, the court could not "find that today, as we sit here, that either child is in danger of physical harm."  The court apparently relied on Mother's testimony, stating that "as to the nutrition [issue], . . . mother was very clear" in "testif[ying] that she understands now and would work to increase those

28

calories and would with a nutritionist." The court later stated, "neither [parent] realized that [O.M.] wasn't getting enough calories," but that they "realize that now." The court thus dismissed counts b-2 and j-2 in addition to all remaining counts.

As discussed above, to obtain reversal Minors must demonstrate that the evidence compels a finding in favor of them as a matter of law because the evidence presented below "was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) We recognize this is a heavy burden for Minors. And yet, Minors have met it here: the uncontradicted evidence *compelled* a finding as a matter of law that O.M. had suffered, and there was a substantial risk that he could continue to suffer, serious physical harm or illness as a result of the parents' inability to adequately protect him from malnutrition (§ 300, subd. (b)(1)(A)); and that E.M. was also at substantial risk of neglect due to the parents' failure to protect her sibling (§ 300, subd. (j)).

In so concluding, we are mindful of our duty not to reweigh conflicting evidence and to indulge all inferences in support of the juvenile court's findings. However, we are not a rubber-stamp. And where, as here, the juvenile court made inferences and conclusions that were simply not supported by the record, we are not obligated to affirm those inferences and conclusions. (See *Kuhn*, *supra*, 22 Cal.App.4th at p. 1633; *Western Digital*, *supra*, 60 Cal.App.4th at p. 1487.)

The court apparently misunderstood Mother's testimony when it asserted that she "was very clear" on whether she had insight into the reasons for O.M.'s hospitalization for his nutritional deficiencies and a plan to

29

address those deficiencies moving forward. Based on our careful review of the entire record, and even assuming the credibility of Mother's testimony, her testimony was far from "clear." A more accurate description of Mother's testimony pertinent to the issue of parental insight is that it was, on its face, self-contradictory, confusing, and/or evasive. And as to her purported plan to address O.M.'s nutritional needs, her testimony lacked sufficient detail and was vague.

On the issue of whether the parents were aware of issues related to O.M.'s nutrition, weight, or overall growth and development, Mother's testimony was internally inconsistent. For example, she initially testified that she did not know O.M. was not receiving enough calories, that she was surprised he was admitted to the hospital for nutritional deficiencies, and that she "didn't know he lost weight at all." However, when later asked whether providers during O.M.'s prior doctor visits mentioned "a change in the growth curves" for his height and weight, Mother testified that "they did mention that [O.M.] may have been getting a little lower in that." Indeed, as Mother concedes in her brief, "[she] knew [O.M.] was losing weight prior [to] the December 2024 incident."

As to whether the parents had the "understand[ing]" and insight into the nutritional deficiencies with which O.M. was diagnosed and for which he was treated, Mother agreed that O.M. needed medical care for his nutritional deficiencies. Yet, she claimed that O.M. had been "medically kidnapped" at UCSF. In her view, O.M. should have been discharged immediately after undergoing surgery on his femur and receiving "a couple of medications" to fix his vitamin deficiencies because she was able to treat O.M.'s nutritional deficiencies on her own thereafter. Mother further maintained that it was "impossible" that O.M. had refeeding syndrome, because O.M. "would have to

30

have been starved for him to get refeeding syndrome" and he "was never starved."

However, Mother then acknowledged that UCSF did not actually diagnose O.M. with refeeding syndrome; rather, it was merely concerned about that possibility. And when pressed several times to clarify whether she believed O.M. was "getting enough to eat" in the two months before his admission to UCSF, Mother spoke in proverbial circles, and at one point asked not to answer the question. As recited above, she testified: "Pretty much. But I—like I—I—he would be picky a little bit sometimes. And I would—I—it's not like—I don't know. I could feed him. I just see where I could feed him a lot more calories." After Mother testified she was "miscommunicating herself" in that response, she was asked the same question again, Mother testified, "pretty much. Like, I—I didn't know he had lost weight. And I was very willing," before being asked the question once more and responding: "I mean, I'm going to say, like, yes. Like, I was feeding him adequately. But, yes, like, I don't know. I mean, it's hard. It's kind of subjective because, like, he was, losing—he lost some weight. And I just didn't know, but he was eating. Like, yeah, he was eating. So I just saw that I should feed him more. You know? So can I not answer that? Is that possible?"

Also, on the issue of the parents giving O.M. soy milk with water, Mother testified, "I never knew it was a problem. I still don't understand why it's a problem."

Finally, as to how the parents would provide O.M. with adequate and proper nutrition if Minors were returned to the parents' care, Mother's testimony lacked sufficient detail and was vague. Mother said she planned to increase O.M.'s calorie intake, but she did not give clear details on how she

31

planned to do so. She said that she would give O.M. food that he liked, as he was a picky eater and would not eat food that he disliked. However, she could not identify the foods that he disliked. She gave examples of food he liked, but even with some of the food she identified, such as, for example, strawberries, she said, "sometimes he won't eat [them]" and "[s]ometimes he'll love [them]." On top of all that, although Mother testified she had signed up for an online basic nutrition class, she had not started it.

In view of the above, the court was incorrect when it stated that Mother's testimony "was very clear" and inferred from her testimony that she "understands now" O.M.'s nutritional deficiencies and how to address them moving forward. Such inferences were not supported by the evidence. Instead, when considered in its entirety, Mother's testimony as a whole provided an unrebutted basis to infer that she was unable or unwilling to fully acknowledge that O.M. was not receiving adequate and proper nutrition at home; did not understand or appreciate the serious health risks O.M. faced and the medical treatment he needed; and lacked a specific plan on ensuring that O.M. would receive adequate and proper nutrition if returned to the parent. Thus, on this record, there was no sound basis for the court to conclude that O.M.'s nutritional problems would not recur if returned home. (Cf. *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["[i]n light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home"]; *In re John M., supra,* 212 Cal.App.4th at pp. 1124–1125 [the "[m]other's subsequent comments and conduct offered no indication that [past conduct] was a unique situation or that mother was unlikely to engage in similar behavior in the future"]; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Petra B.*

(1989) 216 Cal.App.3d 1163, 1170 [parents' continuing "confusion about proper medical treatment posed a then existing threat to [minor's] well-being and justified the court's assumption of jurisdiction"].)

In sum, the uncontradicted evidence compelled a finding as a matter of law that O.M. remained at substantial risk of serious physical harm or illness on the basis of count b-2 (§ 300, subd. (b)).  Consequently, the evidence established that E.M. (whose weight, we note, was also in the lower percentiles and who had the same diet as O.M.) remained at substantial risk of neglect, as alleged in count j-2 (§ 300, subd. (j)).  Accordingly, the court erred in dismissing counts b-2 and j-2.

As noted above, the goal of dependency proceedings is to safeguard the welfare of children who are at risk of neglect or abuse.  (*In re Josiah Z., supra,* 36 Cal.4th at p. 673.)  Here, the court expressed that it was "worried" about Minors, that the parents "need some support," and that it "really felt like [it] needed [to exercise] jurisdiction."  The court was right to have, and ultimately should have yielded to, those inclinations, since the evidence established the protection of Minors required the court's supervision over them.

## DISPOSITION

We reverse the juvenile court's jurisdictional orders dismissing counts b-2 and j-2 of the petitions.  The matter is remanded to the juvenile court with instructions to reinstate counts b-2 and j-2 and enter new orders finding jurisdiction pursuant to section 300, subdivisions (b) and (j), which we urge the juvenile court to do as promptly as possible.  In all other respects, the jurisdictional orders are affirmed.

33

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A173461P)

Superior Court of Humboldt County

Hon. Kelly Neel, Judge

Counsel:

Suzanne Davidson under appointment by the Court of Appeal for Minor Appellants.

Scott Miles, Interim County Counsel Joel Campbell-Blair, Deputy County Counsel, for Plaintiff and Respondent.

Linda Sue Rehm under appointment by the Court of Appeal for Defendant and Respondent D.B.

Law Office of Robert McLaughlin, Robert McLaughlin under appointment by the Court of Appeal for Defendant and Respondent M.M.